# In the United States Court of Federal Claims

**No. 05-1229C**
**Filed: July 11, 2006[1]**
**Reissued for Publication: August 23, 2006**

| | |
|---|---|
| **KSD, INC.,**<br><br>**Plaintiff,**<br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**MCDONNELL DOUGLAS HELICOPTER COMPANY,**<br><br>**Defendant-Intervenor.** | **Pre-Award Bid Protest; Motion to Dismiss; Interested Party; Sole Source Award; Injunctive Relief.** |

**Howell Roger Riggs,** Dick, Riggs, Miller & Stem, LLP, Huntsville, Alabama, for the plaintiff.

**Andrew P. Averbach**, Trial Attorney; **Bryant G. Snee**, Assistant Director; **David M. Cohen**, Director, Commercial Litigation Branch; **Peter D. Keisler**, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for the defendant. **Major Patrick Gary**, United States Army Litigation Center, of counsel.

**Richard B. Clifford, Jr.**, Perkins Coie LLP, Washington, DC, for the Defendant-Intervenor. **Lee P. Curtis**, Perkins Coie LLP, of counsel.

---

[1] This opinion was issued under seal on July 11, 2006. The parties were instructed to propose material for redaction. The original opinion is reissued with redactions indicated by the designation "[deleted]."

## O P I N I O N

**HORN, J.**

This is a pre-award bid protest case in which the plaintiff, KSD, Inc. (KSD), claims that the United States Army failed to follow required and appropriate proceedings, including the Competition in Contracting Act (CICA), 41 U.S.C. § 253 et seq. (2000), when it awarded a sole source contract to the defendant-intervenor, the McDonnell Douglas Helicopter Company (MDHC), a subsidiary of the Boeing Corporation. The plaintiff filed motions for preliminary and permanent injunction and a motion for judgment upon the administrative record. The plaintiff alleges that the Army "violated CICA's mandate for full and open competition by administratively creating excessively priced sole source acquisitions based on the false justification that the 'Fat Boy' is a commercial item that was developed at private expense." The defendant and defendant-intervenor filed motions to dismiss the plaintiff's complaint on the basis that the plaintiff lacks standing to bring its complaint. The defendant and defendant-intervenor also opposed injunctive relief and filed cross-motions for judgment upon the administrative record. After briefing by the parties, at a hearing in court, the court denied the plaintiff's motions for preliminary and permanent injunction and granted the defendant and intervenor's motions for judgment upon the administrative record. This opinion memorializes the decision issued to the parties orally in court.

## FINDINGS OF FACT

This case arises out of a solicitation for main rotor strap assemblies for the AH-64 Apache Helicopter. The main rotor strap assembly retains the main rotor blade to the rotor hub of the helicopter. In 2001, the Army awarded a sole source contract to MDHC for an "improved" main rotor strap assembly, which is commonly refered to by contractors and the government as a "Fat Boy" strap pack. Before the Army began acquiring the "Fat Boy" strap packs from MDHC, the plaintiff, KSD, had provided the Army with an earlier version of the strap pack, known as the "Jenny Craig" strap pack. The 2001 sole source contract to MDHC for "Fat Boy" strap packs expired on December 31, 2005. A new solicitation was issued, a contract awarded, and KSD protests the sole source award of the 2005 "Fat Boy" contract to MDHC.

On May 17, 2005, the United States Army Aviation and Missile Command (AMCOM) published a pre-solicitation notice for solicitation No. W58RGZ-04-R-0982 on the Federal Business Opportunities (FedBizOpps) website, http://www.fedbizopps.gov. The May 17, 2005 notice announced a requirement for 135 parts in support of the Army's AH-64 Apache Helicopter. One of the parts listed in the notice was the Main Rotor Strap Assembly, part no. 7-511411146-3, which is the "Fat Boy" strap pack assembly. The Army has designated the "Fat Boy" strap pack assembly a critical safety item "whose failure, malfunction, or absence could cause loss of or serious damage to the aircraft and/or serious injury or death to the occupants." For this reason, the part may be procured only from an "approved source" that has satisfied the Army's engineering and testing requirements. A source from which this item is to be procured must have "demonstrated the technical ability to produce

this item, including possession of the necessary inspection/test equipment and manufacturing technology. Sources must be approved prior to being awarded a contract for this item." The May 17, 2005 notice stated that the Army intended to award MDHC a three-year, indefinite delivery, indefinite quantity (IDIQ) contract for the 135 different parts, including the "Fat Boy" strap pack assembly, on a sole source basis. The plaintiff protested the 2005 sole source award of the "Fat Boy" contract to MDHC.

To understand the protest under review, a brief review of the relevant background is helpful. MDHC is the designer and manufacturer of the AH-64 Apache Attack Helicopter. KSD is an aerospace manufacturing company engaged in the production of flight safety parts and assemblies for military and commercial helicopters. In 1994, KSD sought and received Flight Safety Part Source Approval for part no. 7-311411146-7, also known as the "Jenny Craig" strap pack. In a May 27, 1997 letter to the United States Army Aviation and Troop Command (ATCOM), KSD made a preliminary inquiry to the Army to determine if there was "a general need or interest in developing a Main Rotor Strap Assembly which would carry a slightly higher load." In its letter, KSD informed the Army that KSD "has the engineering expertise to increase the load carrying capacity of the Strap Assembly." According to the plaintiff, the Army did not respond to KSD's inquiry. On July 25, 1997, KSD submitted an unsolicited proposal to the Army to develop and qualify an improved strap pack assembly at a cost of $51,235.00 to the government, which would provide increased load carrying capacity for the AH-64 Apache Helicopter. According to the Army's own statements, the Army misplaced KSD's July 25, 1997 proposal and did not respond to it.

In 1996, before KSD had submitted its unsolicited proposal to modify the "Jenny Craig" strap pack, Boeing had submitted its own unsolicited proposal to design an improved strap pack for AMCOM. AMCOM conducted an economic evaluation of Boeing's proposal and verbally advised Boeing that government funding was not available for the design of the new strap pack. Boeing, however, was advised that it could pursue an improved strap pack under the Department of Defense's "commercialization initiative," pursuant to which "industry designs, develops and qualifies a new product at their own expense, and then markets it to their customers."

In September, 1999, while Boeing's qualification procedure of the "Fat Boy" was underway, KSD requested an opportunity to compete as a prime vendor for the "Fat Boy" strap pack and requested all engineering data required to support the redesign and testing of the current strap pack assembly. AMCOM responded to KSD's request on October 5, 1999, informing KSD that because the government did not pay Boeing for the redesign of the strap packs, the data is considered proprietary to Boeing and, therefore, cannot be provided for KSD's use. In the same letter, the Army offered to assist KSD in redesigning and qualifying a new strap pack. Specifically, the Army stated that "if KSD is interested in redesigning and qualifying a strap pack, the Government will afford you the same assistance given to Boeing during its redesign and qualification. That assistance includes providing aircraft loads data, support in the development of a new strap pack design, and approval of test plans and test results. The cost to redesign and qualify another strap pack

would, however, have to be at KSD's expense." There is no evidence in the record that KSD responded to this offer for assistance.

On July 18, 1999, the government issued a Justification and Approval (J&A) for a sole source contract of the improved "Fat Boy" strap packs to MDHC. In the J&A, the Army stated that "MDH[C] is the only responsible source capable of providing the supplies or services necessary for manufacture of Apache Longbow aircraft." In a letter sent to AMCOM on September 10, 1999, KSD expressed its concern over the sole-source contract to Boeing, informing AMCOM of KSD's history with the manufacture and production of helicopter strap packs, including more than 4,000 strap packs that were ordered by the Army from KSD for the AH-64 helicopter. In the letter, KSD also requested that it be provided the same opportunity to compete on the 1999 contract as the prime vendor. In response to KSD's September 10, 1999 letter, and to KSD's concerns about the sole source contract to MDHC, the Army stated that Boeing had performed all of the research and development on the new strap pack with no government funding. Therefore, AMCOM contended: "Since the Government did not pay for the Boeing redesign of the strap pack, the data is considered proprietary to the Boeing Company and therefore cannot be provided for your [KSD's] use."

On August 1, 2000, the Army approved Boeing's qualification for its design of the "Fat Boy" strap pack.[2] On November 29, 2000, AMCOM Contracting Officer Robert Deppe executed another J&A for other than full and open competition with respect to the procurement of "Fat Boy" strap packs. The November, 2000 J&A concluded that: "The Apache Attack Helicopter Project Manager's Office has found no other contractor that possesses the detailed technical information required to manufacture the strap packs. No viable competitive alternative exists for this requirement as MDHC is the only source possessing the required technical data and corporate knowledge." The following day, AMCOM published a pre-solicitation notice in the Commerce Business Daily (CBD) providing notice of the procurement of 2100 "Fat Boy" strap pack assemblies upon a sole source basis, with an option to purchase additional strap packs as spares. The notice also stated that a sole source award was justified because "the strap pack is a commercial product developed by MDHC and the technical data is proprietary to the manufacturer."

KSD filed an agency level protest on December 7, 2000, asserting that the "Fat Boy" strap pack was not a commercial item or product as justified by the Army in its November, 2000 J&A. By letter dated February 14, 2001, the Army denied KSD's protest. The Army

---

[2] In a presentation and letter prepared in response to a congressional inquiry, the Army indicated that the "Fat Boy" strap pack had a forecasted service life that was 3 to 4 times longer than the "Jenny Craig," was forecasted to require 62 percent less maintenance than the "Jenny Craig" and was believed to be generally stronger than the "Jenny Craig." In 2005, the Army further determined that ultrasonic and florescent entrant inspection of the "Fat Boy" need only be conducted after 250 flight hours, rather than 125 hours, as had been the case under the "Jenny Craig."

stated in its denial of KSD's agency protest that: "The use of the term 'commercial' as stated in the [Commerce Business Daily] synopsis has been misconstrued and is not used in context of the definition for a commercial item in FAR Part 2.0." The letter continued that the "Fat Boy" had been "solely developed by the McDonnell Douglas Helicopter Company (MDHC) under a contractor funded commercialization program."

On March 19, 2001, the AMCOM Small Business Administration (SBA ) Competition Advocate, Wade Griffin, Jr., approved the November, 2000 J&A, but recommended acquisition of "the basic quantity only" (emphasis in original). In addition, Mr. Griffin requested information concerning "potential sources seeking qualification prior to any option exercise." On April 3, 2001, three weeks later, Ralph Massey, an SBA Procurement Center Representative, sent a memorandum to Mr. Griffin which stated that the "Fat Boy" contract would result in the Army "for all practical purposes, be using this sole source buy to repay Boeing/McDonnell [somewhere between $15M and $20M] for their Non-Recurring Engineering costs for both the development and qualification testing of the new strap assembly." (bracketed language in original). A subsequent memorandum from Mr. Massey in the record, dated April 27, 2001, stated that: "This procurement is a perfect example of the fallacy of depending upon the 'DoD Commercialization Initiative' program to fund needed redesigns of items on a weapons platform, rather than having a PM include an adequate funding line in the POM." The same memorandum indicated that the initial procurement may have been caused by the Army's failure to plan funding for the redesign of the strap pack. Specifically, Mr. Massey stated: "The current undesirable sole source acquisition situation can be traced directly to the decision in the mid 1990s by the 'Strap Team' at St. Louis which did not adequately push the case for NRE [Non-Recurring Engineering] funds to support competition on re-design of an improved MR strap assembly."

On July 31, 2001, the Army awarded MDHC a sole-source contract, No. DAAH23-01-C-0092, to supply 1,992 "Fat Boy" strap packs to AMCOM, with a government option to purchase an additional 220 strap packs. Also, on the same date, the Army modified a different existing contract, No. DAAH23-00-C-0001, for MDHC to provide 240 "Fat Boy" strap packs. Under each contract, the unit price of the "Fat Boy" strap pack was [deleted].

In the 2001 contract and in a separate modification of an existing contract, the government and MDHC specifically agreed that the technical data rights pertaining to the "Fat Boy" strap pack would not be provided to the government. Specifically, the 2001 contract incorporated the clause at Defense Federal Acquisition Regulations Supplement (DFARS) 252.227-7015 (NOV 1995), "Technical Data - Commercial Item," and stated that the section "[a]pplies to Improved Strap Pack, P/N 7-511411146-1. Technical Data pertaining to Improved Strap Pack is not delivered under this contract. The Government's rights are limited to the rights defined in this clause." Similarly, the contract modification for contract No. DAAH23-00-C-0001 stated: "Both parties agree that DFARS [2]52[.]227-7015 is incorporated by reference in Section I and applies to the design and development technical data of the Improved Strap Pack, P/N 7-511411146-1 only. The only data to be delivered under this effort is specified in Section C, Statement of Work, Attachment 01."

The Army's 2001 contract with MDHC, No. DAAH23-01-C-0092, for "Fat Boy" strap packs, expired on December 31, 2005. Before the contract expired, on May 17, 2005, AMCOM completed an acquisition plan identifying a requirement for 135 different spare parts for the AH-64 helicopter, which it proposed to acquire pursuant to a single IDIQ contract with MDHC. Among the parts identified was part number 7-511411146-3, the "Fat Boy" strap pack, which AMCOM had been procuring from MDHC since 2001. AMCOM's acquisition plan for the 2005 contract was approved by the same Competition Advocate, Mr. Griffin, who had approved the November, 2000 J&A for a sole source acquisition, and by AMCOM's small and disadvantaged business utilization office. The defendant states that AMCOM proposed to procure the strap packs through MDHC upon a sole source basis primarily because the straps were assigned an Acquisition Method Reason Code (AMRC) of 3D. Assignment of a 3D code indicated that AMCOM did not possess "complete, accurate or current technical data required to competitively procuring [sic] the parts" and that only MDHC possessed the necessary data. In addition, the "Fat Boy" strap packs were designated as critical safety items, and, therefore, were required to be obtained from an approved source. Also, the Army's "Acquisition Plan for AH-64 System (Apache Spares)," stated that: "Competition for the procurement of the items is not considered economically feasible . . . competition cannot be improved at this time for reasons of lack of data, tooling, knowledge, expertise, and/or qualification testing."

The defendant states, and an AMCOM document reveals, that only MDHC and two sub-vendors, Klune Industries, Inc., and System 3, Inc., had been approved as sources of the "Fat Boy" strap pack. Additionally, the government states that in contemplation of the possibility that sources of Apache spare parts other than MDHC and its sub-vendors might secure approval at a later date, AMCOM's acquisition plan specifically provided that, in the event any new sources of critical safety items such as the strap pack were approved, new orders for such items would not be placed under the contemplated IDIQ contract, but, instead, be separately processed and competitively acquired.

On May 17, 2005, AMCOM posted its pre-solicitation notice on the FedBizOpps website advertising that it was going to sole-source the "Fat Boy" strap pack contract to MDHC. The notice stated that AMCOM intended "to establish a three (3) year Indefinite Delivery Indefinite Quantity (IDIQ) type contract with two unpriced options to extend the period of performance for an additional three years (each option) applicable to AH-64 Apache Helicopter Spares." AMCOM's presolicitation notice incorporated "Note 22," which is found at http://www.fedbizopps.gov/Numbered_Notes.html, and provides:

> The proposed contract action is for supplies or services for which the Government intends to solicit and negotiate with only one source under the authority of FAR 6.302. Interested persons may identify their interest and capability to respond to the requirement or submit proposals. This notice of intent is not a request for competitive proposals. However, all proposals received within forty-five days (thirty days if award is issued under an existing basic ordering agreement), after date of publication of this synopsis will be considered by the Government. A determination by the Government not to

compete with this proposed contract based upon responses to this notice is solely within the discretion of the Government. Information received will normally be considered solely for the purpose of determining whether to conduct a competitive procurement.

The defendant claims that neither KSD, nor any other party, communicated to AMCOM an interest in and a capability of producing "Fat Boy" strap packs within the 45-day window as required by Note 22. The plaintiff, however, claims that it did express an interest in the strap pack contract within the 45-day period. Specifically, KSD claims that its representative, Les McCollum, made weekly visits to the AMCOM Competition Advocate, Wade Griffin, and that some of those meetings occurred during the required 45-day period. KSD claims that Mr. McCollum communicated KSD's interest in the procurement of the "Fat Boy" strap pack to the Competition Advocate during those visits. In addition, on September 29, 2005, after AMCOM had denied KSD's agency-level protest, and after KSD had lodged its protest with the GAO, KSD submitted a letter to AMCOM indicating that KSD believed that "because of the minor revisions which are dimensional only our prior qualification to manufacture MRSA P/N: 7-311411146-7 is sufficient. KSD intends to submit a proposal for a product which meets all dimensional and performance criteria."

Concurrently with the publication of the pre-solicitation notice, AMCOM prepared the "Justification Review Document for other than Full and Open Competition" to procure the "Fat Boy" strap pack and 134 other Apache spare parts from MDHC upon a sole source basis. This justification was approved on July 25, 2005 by Claude M. Bolton, Jr., the Assistant Secretary of the Army for Acquisition, Logistics and Technology. On May 26, 2005, a separate document requesting approval of the justification regarding the "Fat Boy" strap pack was also signed by the Head of the Contracting Activity. In addition, a separate justification was prepared solely for the "Fat Boy" strap pack and was independently approved by Wade Griffin, Jr., AMCOM's Small Business Competition Advocate. The government suggests that this separate justification reflects AMCOM's specific conclusion that the Army lacked the technical data necessary to conduct a competitive procurement for the "Fat Boy" strap pack. The government further states that although the Competition Advocate had conducted market research by publishing the item in its March, 2005 "Shopping List," no new potential sources had either expressed interest in producing the "Fat Boy," or otherwise been identified. Following approval of the 135-item J&A by the Assistant Secretary of the Army, AMCOM issued solicitation W58RGZ-04-R-0982 to MDHC.

KSD submitted an agency level protest to AMCOM on August 15, 2005. KSD based its agency protest on two claims. First, KSD argued that the "Fat Boy" strap pack was a modification of an existing part, which was owned by the government, and that the modification was based on a "Commercialization Initiative," but that the new part does not meet the definition of a "Commercial Item" under FAR 2.101 (2005). Second, KSD argued that the solicitation for the "Fat Boy" strap pack did not "conform with the spirit, intent, or requirements of the Competition in Contracting Act of 1984." KSD stated that the Army's

action "has resulted in all competition being eliminated for this item in the future." Among the relief requested, KSD requested in its agency protest that the Army provide KSD with technical data so that it could submit a Source Approval Package.

The Army responded to and denied KSD's agency protest on September 15, 2005. In its response, the Army stated that because Boeing developed the "Fat Boy" at private expense, "the technical data package is proprietary data not owned by the Government, and therefore unavailable for distribution by the Army." The Army further stated that: "The Main Rotor Strap Assembly is not a commercial item as defined by the Federal Acquisition Regulations. (FAR) Subpart 2.101." In another AMCOM internal memorandum, the Army indicated that "the strap pack does not qualify as a commercial item under the Federal Acquisition Regulation (FAR) 2.101(b), definition of a commercial item. The AH-64 Attack Helicopter is dedicated to a military function with no civilian counterpart." Similarly, in the July 25, 2005 J&A, for the "Fat Boy" strap pack, the Army further stated that "none of these items are identified as commercial items."[3]

KSD initially protested to the General Accounting Office (GAO), which dismissed KSD's protest on October 31, 2005. The GAO found that KSD was "not an interested party within the meaning of [GAO's] Bid Protest Regulations, 4 C.F.R. § 21.0(a) (2005)." In its opinion, the GAO stated: "We have consistently held that, where an agency issues a presolicitation notice advising that it intends to conduct a sole-source acquisition, a prospective offeror is required, as a perquisite [sic] to filing a protest in our Office, to have submitted a timely expression of interest in response to the FedBizOp[p]s notice. . . . It follows that where, as here, a firm does not submit a timely expression of interest in response to the Presolicitation notice, it is ineligible to compete for the requirement." Thus, the GAO dismissed KSD's protest because it found that it did not respond to AMCOM's presolicitation notice posted on the FedBizOpps website on May 17, 2005. KSD filed its bid protest complaint and motions for preliminary and permanent injunction in this court on November 22, 2005.

## DISCUSSION

### 1. Defendant's and Intervenor's Motions to Dismiss

The defendant and intervenor filed motions to dismiss pursuant to RCFC 12(b)(1). Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, and even on appeal. See Fanning, Phillips, Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998) (quoting Booth v. United States, 990 F.2d 617, 620 (Fed. Cir.), reh'g

---

[3] Indicating how the product was developed, but not addressing the issue of proprietary rights, a Boeing document in the record, titled "Qualification of New Design Main Rotor Strap Pack," states that: "A Commercialization Approach agreed upon by the US Army Aviation and Missile Command (AMCOM) Huntsville, Alabama and Boeing was used to develop the design."

denied (1993)); United States v. Newport News Shipbuilding and Dry Dock Co., 933 F.2d 996, 998 n.1 (Fed. Cir. 1991). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). A plaintiff must establish jurisdiction by a preponderance of the evidence. See Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Thomas v. United States, 56 Fed. Cl. 112, 115 (2003); Martinez v. United States, 48 Fed. Cl. 851, 857 (2001), aff'd in part, 281 F.3d 1376 (Fed. Cir.), reh'g denied (2002); Bowen v. United States, 49 Fed. Cl. 673, 675 (2001), aff'd, 292 F.3d 1383 (Fed. Cir. 2002); Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 73 (2000); Alaska v. United States, 32 Fed. Cl. 689, 695 (1995), appeal dismissed, 86 F.3d 1178 (Fed. Cir. 1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of [the] claim which would entitle [the plaintiff] to relief." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 654 (1999) (quoting Conley v. Gibson, 355 U.S. 41, 46 (1957)); Brubaker Amusement Co. v. United States, 304 F.3d 1349, 1355 (Fed. Cir. 2002), cert. denied sub nom. Penn Triple S v. United States, 538 U.S. 921 (2003); Leider v. United States, 301 F.3d 1290, 1295 (Fed. Cir.), reh'g and reh'g en banc denied (2002), cert. denied, 538 U.S. 978 (2003); Conti v. United States, 291 F.3d 1334, 1338 (Fed. Cir.), reh'g en banc denied (2002), cert. denied, 537 U.S. 1112 (2003); Consol. Edison Co. v. O'Leary, 117 F.3d 538, 542 (Fed. Cir. 1997), cert. denied sub nom. Consol. Edison Co. v. Pena, 522 U.S. 1108 (1998); see also New Valley Corp. v. United States, 119 F.3d 1576, 1579 (Fed. Cir.), reh'g denied, and reh'g en banc declined (1997); Highland Falls-Fort Montgomery Cent. School Dist. v. United States, 48 F.3d 1166, 1169 (Fed. Cir.), cert. denied, 516 U.S. 820 (1995); Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989); W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d 1362, 1364 (Fed. Cir. 1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.'"); RCS Enters., Inc. v. United States, 46 Fed. Cl. 509, 513 (2000).

Pursuant to RCFC 8(a)(1) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.), reh'g denied (1997) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983); Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding a motion to dismiss based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Conley v. Gibson, 355 U.S. at 45-46; Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002); Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1338 (Fed. Cir. 2001) (quoting New Valley Corp. v. United States, 119 F.3d at 1580), cert. denied, 535 U.S. 1096 (2002); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000); Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998); Highland Falls-Fort Montgomery Cent. School Dist. v. United States, 48 F.3d at 1167 (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995); Hamlet v. United States, 873 F.2d at 1416; Ho v. United States, 49 Fed. Cl. 96, 100 (2001), aff'd, 30 Fed. Appx. 964 (Fed. Cir. 2002); Alaska v. United States, 32 Fed. Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Land v. Dollar, 330 U.S. 731, 735 n.4 (1947); Reynolds v. Army and Air Force Exch. Serv., 846 F.2d at 747; Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404-05 (1994).

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. See 28 U.S.C. § 1491 (2000). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Testan, 424 U.S. 392, 400, reh'g denied, 425 U.S. 957 (1976) (citing Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-06, 372 F.2d 1002, 1009 (1967)); see also Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Stinson, Lyons & Bustamante, P.A. v. United States, 33 Fed. Cl. 474, 478 (1995), aff'd, 79 F.3d 136 (Fed. Cir. 1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." INS v. St. Cyr, 533 U.S. 289, 299 n.10 (2001); United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992); Ins. Co. of the West v. United States, 243 F.3d 1367, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (2001); Saraco v. United

States, 61 F.3d 863, 864 (Fed. Cir. 1995) (quoting United States v. King, 395 U.S. 1, 4 (1969)), cert. denied, 517 U.S. 1166 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims; "'it does not create any substantive right enforceable against the United States for money damages.'" United States v. Mitchell, 445 U.S. 535, 538 (quoting United States v. Testan, 424 U.S. at 398-99), reh'g denied, 446 U.S. 992 (1980); White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001), aff'd, 537 U.S. 465 (2003); Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000), cert. denied, 532 U.S. 1065 (2001); New York Life Ins. Co. v. United States, 118 F.3d 1553, 1555-56 (Fed. Cir. 1997), cert. denied, 523 U.S. 1094 (1998); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 465 U.S. 1065 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. United States v. Mitchell, 445 U.S. at 538. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" White Mountain Apache Tribe v. United States, 249 F.3d at 1372 (quoting United States v. Mitchell, 463 U.S. 206, 216-17 (1983)); United States v. Testan, 424 U.S. at 400; Tippett v. United States, 185 F.3d 1250, 1254 (Fed. Cir. 1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998), reh'g denied (1999)); Doe v. United States, 100 F.3d 1576, 1579 (Fed. Cir. 1996), reh'g and reh'g en banc denied (1997); Eastport Steamship Corp. v. United States, 178 Ct. Cl. at 607, 372 F.2d at 1009.

The defendant and intervenor have filed their motions to dismiss arguing that KSD is not an interested party and, therefore, lacks standing to brings its case. According to a decision by the United States Court of Appeals for the Federal Circuit, "[s]tanding to sue is a threshold requirement in every federal action." Sicom Sys., Ltd. v. Agilent Tech., 427 F.3d 971, 975 (Fed. Cir. 2005); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."). The party invoking federal jurisdiction bears the burden of establishing standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Myers Investigative & Sec. Servs., Inc., v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002); see also Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

The Tucker Act provides that this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491 (b)(1) (2000). See Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319. Although section 1491(b)(1) does not define the term

"interested party", the United States Court of Appeals for the Federal Circuit has adopted the definition set forth in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(A). See Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370. In Myers, the Federal Circuit set forth the applicable defitiniton of an "interested party":

> In bid protests under the Tucker Act, "we . . . construe the term 'interested party' in section 1491(b)(1) in accordance with the [standing requirements of the] CICA and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n [of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)]. Thus, the substantial chance rule continues to apply.

Myers Investigative & Security Services, Inc. v. United States, 275 F.3d at 1370 (omission in original); see also Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1351-52 (Fed. Cir. 2004) ("Under the Competition in Contracting Act (CICA), which governs the bid protest jurisdiction of the General Accounting Office (GAO), a protest may be filed by an "interested party." 31 U.S.C. § 3551(1). The CICA explicitly defines the term as 'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' 31 U.S.C. § 3551(2)."). Therefore, in order to establish standing, a plaintiff must show that it is an "'actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract,'" Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 (quoting Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 1113 (2002)); but see also CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 570 (2004) ("Where a claim is made that the Government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it would have competed for the contract had the Government publicly invited bids or requested proposals."), aff'd, No. 05-0501, 2005 WL 3292539 (Fed. Cir. Dec. 6, 2005). For its "direct economic interest" to be affected, the protestor must show that it was prejudiced by the award. See Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Security Services, Inc. v. United States, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing"); Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 270 (2004), opinion modified on other grounds, 63 Fed. Cl. 141 (2004). To establish prejudice, a protestor must demonstrate that it had a "substantial chance" to have received the award, had it not been for the agency errors in the procurement. Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)); Info. Tech. & Applications Corps. v. United States, 316 F.3d at 1319; Hunt Bldg. Co. v. United States, 61 Fed. Cl. at 270 (finding that protestor was one of two offerors in the competitive range, with both deemed by the agency to be outstanding, and that, therefore, had there been level playing field, the protestor would have had a substantial chance of winning the procurement).

The challenge for trial courts in bid protest, injunctive relief cases is determining when the trial court has sufficient information to determine with any degree of certainty whether a protester has been prejudiced, that is, whether there was a substantial chance that the protestor would have received the award, but for agency errors in the procurement process. The court's early review of a request for a temporary restraining order or preliminary injunctive relief often occurs before the administrative record has been presented to the trial court. Almost immediately after the complaint is filed, trial courts must make an initial standing determination, including a prejudice determination, based on the allegations in the complaint taken as true, and the exhibits attached thereto. Thus, trial courts often must engage in a two-step process to determine standing, although the United States Court of Appeals for the Federal Circuit has stated that standing to sue is "a threshold requirement in every federal action." Sicom Sys. Ltd. v. Agilent Tech, 427 F.3d at 975; see also Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("[T]he prejudice issue must be reached before addressing the merits.")

The first trial court review of standing, shortly after the complaint is filed, results in a preliminary decision by the trial court as to whether the case should proceed and the administrative record should be compiled, or whether under no circumstances can the plaintiff pass the test for standing, including demonstrating prejudice. After presentation of the administrative record to the court, briefing by the parties and oral presentations, if appropriate, the issue of prejudice as well as entitlement to relief is more fully reviewable. Further exploration by the court may be warranted prior to concluding whether prejudice has occurred and whether the plaintiff is entitled to relief. Thus, a case may have to proceed through full review of a request for permanent injunctive relief before the trial court can relate back to the jurisdictional issue of standing and accurately determine whether a protestor has been prejudiced and whether the protestor does or does not have standing.

In this case, the defendant and intervenor make two arguments as to why the plaintiff is not an interested party. First, they argue that KSD is not an interested party because it was not an approved source for the procurement of the "Fat Boy" strap pack. Second, the defendant and intervenor argue that even if KSD were an approved source, KSD still lacks standing because it did not respond to the Army's pre-solicitation notice within 45 days, and did not inform the Army that KSD was an interested bidder.

In order to have standing to protest a sole-source award, a bidder "must show that it would have been a qualified bidder." Meyers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370-71. To support its argument that KSD lacks standing because it was not an approved source or qualified bidder, the defendant cites to Space Exploration Technologies Corp v. United States, 68 Fed. Cl. 1 (2005). In Space Exploration, a plaintiff protested the sole source award of a United States Air Force contract for expendable launch vehicles. In Space Exploration, similar to this case, the defendant filed a motion to dismiss arguing that the plaintiff lacked standing. In that case, however, the defendant and intervenor argued that the plaintiff lacked standing because it did not submit a bid for the contract. Id. at 4. The court found significant in Space Exploration, unlike the case at bar, that the plaintiff conceded that it was unable to perform the work being solicited by the

Air Force. Id. at 5 ("Most significantly, plaintiff admits that it will not have full EELV launch capability prior to FY07.").

In the case currently before the court, KSD argues that it could have manufactured the "Fat Boy" strap, but that the government improperly withheld the technical information KSD needed in order to produce the "Fat Boy" strap pack. The plaintiff argues that the Army inappropriately informed KSD that the "Fat Boy" strap pack was developed by Boeing at Boeing's expense and that, therefore, the technical information regarding the "Fat Boy" strap pack was proprietary to Boeing and could not be provided to KSD. In short, KSD argues that it was the Army's actions that prevented KSD from becoming an approved "Fat Boy" strap pack manufacturer. The plaintiff states: "The Defendant's argument is predicated upon the very actions that KSD complains violated applicable statutes and regulations."

The plaintiff relies on Cubic Defense Systems, Inc. v. United States, 45 Fed. Cl. 239, 247, appeal dismissed, 230 F.3d 1375 (Fed. Cir. 1999), a case which the government also uses in an attempt to support its own argument. In Cubic, the court stated that:

> Cubic's claim points to the Government's actions as the cause of its inability to compete and as the root cause of the alleged CICA violation. Therefore, to accept the Government's arguments potentially would allow the Government, through its own actions, to exclude a party from a procurement, thereby hindering competition, and then rely upon those actions to contend that the excluded party was not a prospective offeror and thus not an interested party. See ATA Defense Indus., 38 Fed. Cl. at 495. To do so would subvert the aims of CICA, constrict this court's jurisdiction in contrast with Congress' recent expansion of it, and enable the Government to assert standing to immunize its planned sole-source procurements from CICA-based challenges.

Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. at 247; see also ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 399 (2003) (finding that a plaintiff that did not submit a bid had standing because the plaintiff was "discouraged" by alleged improprieties from submitting a bid during the agency's solicitation process); Cybertech Group Inc. v. United States, 48 Fed. Cl. 638, 644 (2001) (finding that a plaintiff had standing because the agency's failure to provide plaintiff with a Request for Quotations was the reason for the plaintiff failing to submit a bid); ATA Def. Indus., Inc. v. United States, 38 Fed. Cl. at 495 ("But if these procedures did violate controlling statutes and regulations, then the procedures cannot properly serve as a rationale for excluding plaintiff from coming within the scope of Section 1491(b)"). Therefore, when the government's actions wrongfully prevent a bidder from qualifying for or bidding on a solicitation, the government cannot use the contractor's failure to qualify or bid on the solicitation as grounds for finding a lack of standing.

In considering defendant's and intervener's motions to dismiss, the court must accept as true all of plaintiffs' well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. See Godwin v. United States, 338 F.3d 1374, 1377 (Fed. Cir. 2003); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000); Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998); see also Hammitt v. United States, 69 Fed. Cl. 165 (2005); Patton v. United States, 64 Fed. Cl. 768, 773 (2005). If the facts reveal a basis upon which the non-movant might prevail, the motion will be denied. See W.R. Cooper Gen. Contractor, Inc. v. United States, 843 F.2d at 1364.

Although KSD admits that it was not an approved source for the "Fat Boy" strap pack, it argues that it could not obtain approval because the government erroneously withheld the technical data pertaining to the "Fat Boy" strap pack. Moreover, KSD asserts in its complaint that the government had reimbursed Boeing for development of the "Fat Boy" strap pack and that, therefore, the strap pack was not a commercial item as alleged by the Army. Based upon the plaintiff's complaint at the early stage of this case, the court could not determine whether Boeing had developed the "Fat Boy" strap pack on its own or whether the government had paid for or obtained any data rights to the "Fat Boy" strap pack. Accepting the plaintiff's uncontroverted allegations in its complaint as true, the court denied the defendant's and intervenor's early motions to dismiss.

In addition to arguing that KSD was not an "interested party" because it was not approved by the Army to supply the "Fat Boy" strap pack, the defendant and intervenor also argue that because KSD did not respond to the pre-solicitation notice within 45 days, KSD lacks standing to protest the sole-source award. The CICA requires agencies to achieve full and open competition through the use of competitive procedures. See 10 U.S.C. § 2304 (2000). CICA, however, permits seven exceptions to the full and open requirement under appropriate circumstances. See 10 U.S.C. § 2304(c)(1)-(7). One exception to the requirement for full and open competition exists when the product or service is available from only one responsible source. See 10 U.S.C. § 2304(c)(1). When the government intends to award a sole source contract on the basis that the identified source is the only responsible source available, it is required, under CICA, to publish notice with respect to such contract. See 10 U.S.C. § 2304(f)(1)(C).[4] Under FAR 5.207(e) (2005), when applicable, this notice must include any relevant numbered notes, including Note 22, quoted in full above.

Note 22 notifies interested parties that they should inform the responsible agency of their interest and capability to perform the anticipated contract work or submit proposals within forty-five calendar days of the publication of the presolicitation notice. See FN Mfg., Inc. v. United States, 41 Fed. Cl. 186, 188 n.3 (1998) ("The Federal Procurement Regulations dictate the inclusion of Note 22 in all proposed contract actions intended for

[4] Notices of proposed contract actions must be made available pursuant to the Small Business Act, 15 U.S.C. § 637(e) (2000) and the Office of Federal Procurement Policy Act, 41 U.S.C. § 416 (2000).

award on a sole-source basis."); Standard Mfg. Co., Inc. v. United States, 7 Cl. Ct. 54, 56 (1984) ("Department of Defense FAR Supplement § 5.207, 'Preparation and Transmittal of Synopses,' as in force throughout the period here relevant, required that a reference to Note 22 be included in any synopsis for a sole source contract (and defined its contents).").

To support its claim that bidders must respond to the pre-solicitation notice in a timely manner in order to have standing to protest the award, the defendant and intervenor cite to Cubic Defense Systems, Inc. v. United States, 45 Fed. Cl. at 249. In Cubic, the court stated that to have standing as an interested party under Note 22, a contractor must take "affirmative, responsive action," in response to a Note 22 pre-solicitation notice. Id. In Cubic, the plaintiff had made several telephone calls to the contracting agency inquiring about the procurement and showing its interest in bidding on the proposal. The Cubic court found that based upon those telephone calls, the bidder had adhered to the requirements of Note 22, even though it had not actually submitted a formal proposal or anything in writing indicating its interest and ability to perform the contract. Id. at 252. The court stated that "Although Cubic's actions and response to the Commerce Business Daily (CBD) notice do not rise to the level that one ideally would like to see from a party contesting a planned sole-source procurement, these actions are sufficient to allow Cubic to survive a motion to dismiss." Id.

To further support its argument that KSD was required to respond to the presolicitation notice within 45 days in order to have standing as an interested party, the intervenor cites to the GAO opinion in Simula Government Products, Inc., B-274,730; 96-2 CPD ¶ 219, 1996 WL 705191 (Comp. Gen. Dec. 9, 1996). In Simula, the GAO found that responding to the Note 22 pre-solicitation notice within 45 days was a strict requirement to have standing to protest a sole source solicitation and stated:

> In this regard, where a complex requirement is involved, a mere expression of interest in the procurement does not meet the requirements of note 22–an adequate response must at least detail the offeror's ability to meet the requirement; what is actually contemplated is a preliminary proposal which could lead the agency to reconsider the sole-source decision.

Simula Gov't Prods., Inc., B-274,730; 96-2 CPD ¶ 219, at 2. (citing Litton Computer Servs., B-256225.4; B-256225.5, 94-2 CPD ¶ 36, 1994 WL 389122 (Comp. Gen. July 21, 1994). In Simula, the GAO found insufficient a submission of only an "undocumented, unexplained, assertion that it could meet the requirement." Id. Without more, the agency was unable to assess whether or not there was only one source capable of meeting the requirement. See id.

Although this court agrees that a potential offeror's expression of interest should be more than a fleeting or passing mention that it is interested in the procurement and capable of producing the requirement, a judge of this court in Cubic did not establish as strict a standard as that suggested by the GAO. In Cubic, while recognizing the GAO requirement for a party to indicate its interest and capability to perform, the court found a telephone call

made to the contracting agency in which a contractor expressed its interest in a procurement to be sufficient to show a contractor's interest in the procurement. See Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. at 250. The Cubic court also found that requiring the plaintiff to have indicated in detail its capability to the agency during the forty-five day period required by Note 22 "would not be constructive" because the plaintiff's complaint in Cubic stated that the government's actions rendered the plaintiff incapable of competing for the contract. Id. Finally, the Cubic court refused to set forth a strict forty-five day proposal submission deadline as a prerequisite to challenging a sole-source procurement. See Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. at 252 ("The court is not categorically opposed to enforcing a forty-five day proposal submission deadline as a prerequisite to challenging a planned sole-source procurement in this court, however the facts in this case counsel against adopting such a standard rule at this time."). Therefore, contrary to the defendant's and intervenor's arguments that a contractor must show its interest and capability to perform the contract, in the Court of Federal Claims, it was found sufficient by a judge of this court in Cubic, for a contractor not to demonstrate both "interest" and "capability" to perform in response to a solicitation, but simply to inform the contracting agency that it is interested in and could qualify for the solicitation when the claim upon which the plaintiff rests is founded in the government's own alleged wrongful acts.

The same argument as raised in Cubic is raised by KSD in this case, that the government's actions in withholding technical data made KSD incapable of competing for the contract. KSD claims in its reply to defendant's motion to dismiss that it did indicate interest within 45 days as required by Note 22, although it did not submit a formal proposal during that time. Specifically, KSD argues that its representative, Les McCollum, made weekly visits to the Army's Competition Advocate, Wade Griffin, some of which occurred during the 45-day period. The plaintiff claims that during those visits, Mr. McCollum communicated KSD's interest in the procurement of the "Fat Boy" strap pack to the government. The plaintiff, therefore, argues that its actions were consistent with the requirements set forth in Cubic. In addition to arguing that it informed the defendant during the 45-day period that it was interested in competing for the "Fat Boy" solicitation, plaintiff argues that the "Fat Boy" strap pack is simply a modification of strap packs KSD had previously made for the Army and that KSD had informed the Army numerous times that KSD had the capability to improve the strength and load capacity of its strap packs. In support, KSD cites to letters it sent to the Army, including an unsolicited proposal, which informed the Army that KSD had the potential to manufacture a strap pack with improved load capacity. Although the plaintiff provides the court with unconfirmed facts that it contacted the Army during the 45-day period, those facts were not contested by the government and using the Cubic standard, are sufficient to show that the plaintiff has standing. Given the minimal facts before the court early in the case, the court was unable to determine that the plaintiff was without standing and, therefore, denied, the defendant's and intervenor's motions to dismiss.

**2. Standard of Review for Bid Protest Cases**

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. See 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970) and the line of cases following that decision. See, e.g., Galen Medical Assocs., Inc. v. United States 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), reh'g denied (2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000)[5]; see also

---

[5] The full language of section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of

Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A) (2000))). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit has discussed specifically subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. See Impresa Contruzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.))), reh'g denied (2000); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) ("The APA provides that a reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (Supp. V 1999)."), reh'g and reh'g en banc denied (2001); RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

In Impresa Construzioni Geom. Domenico Garufi v. United States, the court wrote:

> Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. . . . When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," id., and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994). When a challenge is brought on the second ground, the

---

the rule of prejudicial error.

5 U.S.C. § 706.

> disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." Kentron [Hawaii, Ltd. v. Warner,] 480 F.2d [1166,] 1169 [(D.C. Cir. 1973)]; Latecoere, 19 F.3d at 1356.

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (selected citations omitted); see also Banknote Corp. of Am. v. United States, 365 F.3d at 1351; OMV Med., Inc. v. United States, 219 F.3d 1337, 1343 (Fed. Cir. 2000).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Labat-Andersen Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 222, aff'd, 264 F.3d 1071 (Fed. Cir. 2001); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 619 (2001); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999), appeal dismissed, 6 Fed. Appx. 867 (Fed. Cir. 2001). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); but see In re Sang-Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform a meaningful review . . . . ").

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003) (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in

> accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted); see also U.S. Postal Service v. Gregory, 534 U.S. 1, 6-7 (2001) ("[T]he arbitrary and capricious standard is extremely narrow and . . . . [i]t is not for the Federal Circuit to substitute its own judgment for that of the Board.") (citations omitted); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang-Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. United States, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Group, Inc. v. United States, 61 Fed. Cl. 338, 351 (2003) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 Fed. Appx. 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))); Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 231 (1997); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 154 (1997); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 672 (1997); Commercial Energies, Inc. v. United States, 20 Cl. Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted)).

Similarly, in E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-

> 1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).
>
> * * *
>
> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") . . . .

E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59); see also Hayes Int'l Corp. v. United States, 7 Cl. Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement . . . ." (citing Sperry Flight Sys. v. United States, 212 Ct. Cl. 329, 339-40, 548 F.2d 915 (1977))); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Am. Tel. and Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002), cert. denied, 540 U.S. 937 (2003); Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Cybertech Group, Inc. v. United States, 48 Fed. Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."). In Burroughs Corporation v. United States, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in Sperry Flight Systems Division v. United States, 212 Ct. Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract - a responsibility that rests with the contracting officer alone - is inherently a judgmental process which cannot accommodate itself to absolutes, at least

> not without severely impairing the quality of the judgment called for . . ." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

Burroughs Corp. v. United States, 223 Ct. Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995); JWK Int'l Corp. v. United States, 49 Fed. Cl. at 388; Mantech Telecomms. and Info. Sys. Corp. v. United States, 49 Fed. Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated that:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69 . . . .

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958-59; see also Galen Medical Assocs., Inc. v. United States, 369 F3d at 1330; Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1046.

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted)). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis and were, therefore, arbitrary or capricious.

To prevail in a bid protest case, the protester must not only show that the government's actions were arbitrary, capricous, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").

Recognizing the two-step analysis of bid protest cases, the Federal Circuit recently stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (1999) (citation omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corporation v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2)

> ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d at 1358 ("To establish prejudice Bannum [the plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors in the bid process." (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; and Statistica, Inc. v. Christopher, 102 F.3d at 1582)).

In this case, the court is reviewing a sole source award. Regarding the standard of review to be applied to sole source contracts, the Federal Circuit has stated that: "Identical review standards apply under the APA in the context of a sole-source award." Emery Worldwide Airlines, Inc. v. United States, 264 F.3d at 1086 (citing Myers Investigative &Sec. Servs., Inc. v. United States, 47 Fed. Cl. 605 (2000), aff'd 275 F.3d 1366 (Fed. Cir. 2002) (using bid protest jurisprudence under the APA in a sole-source award context)). "[A] sole source award may be set aside if either: '(1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure.' See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332." Id.

**3. Plaintiff's Motion for Judgment Upon the Administrative Record**

The plaintiff has filed its motions for preliminary and permanent injunction and motion for judgment upon the administrative record arguing that the Army violated CICA when it solicited a sole source contract to MDHC. Specifically, the plaintiff argues that AMCOM violated CICA's requirements for full and open competition by issuing solicitation No. W58RGZ-04-R-0982, "which proposes to sole source the award of the production and manufacture of the 'Fat Boy' Strap Pack, Part No. 7-511411146-3, to Boeing." Additionally, the plaintiff argues that AMCOM violated CICA by "administratively creating excessively priced sole source acquisitions based on the false justification that the "Fat Boy" is a commercial item that was developed at private expense.

In its J&A for the 135-part contract, which was signed by the Assistant Secretary of the Army on June 25, 2005, and included the "Fat Boy" strap pack, the Army stated:

> Full screening has been conducted on these items in accordance with (IAW) the Defense Federal Acquisition Regulation Supplement (DFARS) Appendix E. Breakout Engineering has determined competition cannot be improved at this time due to: (1) these parts have been determined to require source qualification prior to contract award, because of the complexity or the criticality of the parts; (2) the government does not possess complete, accurate, or current technical data required to competitively procure the

> parts, and there is no avenue for getting the required data; (3) manufacture of the part requires use of master or coordinated tooling; or (4) the government does not have adequate data, lacks rights to data, or both needed to purchase this part from additional sources. Competition cannot be improved at this time for reasons of data, knowledge, expertise, tooling and/or qualification testing required.

Additionally, in the justification, the Army invoked FAR 6.302-1(a)(2) (2005), which states that: "When the supplies or services required by the agency are available from only one responsible source, or, for DoD, NASA, and the Coast Guard, from only one or a limited number of responsible sources, and no other type of supplies or services will satisfy agency requirements, full and open competition need not be provided for." See also 10 U.S.C. § 2304(c)(1) (authorizing less than full and open competition when property or services are available from only one responsible source). Furthermore, in denying KSD's agency protest, the defendant justified its award of the "Fat Boy" contract to MDHC through a sole source procurement by stating that: "Since Boeing developed the design at private expense, the technical data package is proprietary data not owned by the Government, and therefore unavailable for distribution by the Army."

In its motion for preliminary and permanent injunction, KSD argues that: "The claim that the technical data for the 'Fat Boy' is proprietary to Boeing because it developed the design for the 'Fat Boy' at private expense is nothing short of a sham." As support for its argument, the plaintiff states that, in 1999, the AMCOM Contracting Officer, Lisa Strangle informed KSD that, in 1996, "Boeing was verbally informed that government funding was not available to pursue the development of a new strap pack. However, Boeing was advised that they could pursue the new strap pack under the DoD commercialization initiatives in which industry designs, develops and qualifies a new product at their own expense, and then markets it to their customers." The plaintiff argues that "[b]y advising Boeing to pursue the redesign as a commercial item paid for at Boeing's private expense, AMCOM was enabled to assert that the data necessary to manufacture the 'Fat Boy' is proprietary to Boeing, thus setting the stage for a sole source contract to Boeing."

The plaintiff further argues that AMCOM's claim that the "Fat Boy" data is proprietary to Boeing is flawed for two reasons. First, KSD argues that the "Fat Boy" strap pack is not a commercial item, but is designed only for the Apache Helicopter, and there are no other customers for the "Fat Boy" strap pack. Second. KSD argues that Boeing did not design the "Fat Boy" strap pack at private expense, and that "it was never AMCOM's intention that it would do so."

A commercial item is defined by FAR 2.101(b) as "(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and– (i) Has been sold, leased, or licensed to the general public; or (ii) Has been offered for sale, lease, or license to the general public . . . ." With regard to whether the "Fat Boy" strap pack is a commercial item, KSD points out that AMCOM was aware that the "Fat Boy" strap pack was not a

commercial item. Specifically, the plaintiff cites to a purported AMCOM internal memorandum submitted with the administrative record in this case that states that "the strap pack does not qualify as a commercial item under the Federal Acquisition Regulation (FAR) 2.101(b), Definition of a commercial item. The AH-64 Attack Helicopter is dedicated to a military function with no civilian counterpart."

Also in the record as part of the sole source justification are the following words:

> As noted, these items are not considered commercial due to unique system requirements and no commercial equivalents were identified by engineering during the screening process. It has been determined that the government's needs cannot be met by an item available in the commercial marketplace; therefore, FAR Part 12 will not be used. Potential new sources and/or conversion to commercial items continue to be a major consideration as items are screened.

Unfortunately, the DoD was inconsistent in its use of the term "commercial." On the one hand, defendant argues that the AH-64 Attack Helicopter and adherent parts are not available on the "commercial market" and that no "commercial" equivalents to what is being provided have been identified. On the other hand, the government argues that it could not make the technology available to KSD because the "Fat Boy" strap pack was developed by Boeing, at Boeing's expense, under a "commercialization initiative." Although confusing, as is discussed more fully below, the position taken by the plaintiff is not sufficient to defeat the government's argument. Moreover, due to the military nature and use of the product, these items and technology appear not to have been available on the open "commercial market."

KSD also identifies a memorandum to Wade Griffin, the AMCOM contracting officer, from Ralph Massey, the Small Business Administration's Procurement Center Representative. In the 2001 memorandum, Mr. Massey stated, concerning the "Fat Boy" procurement: "It appears that the Army will, for all practical purposes, be using this sole source buy to re-pay Boeing/McDonnell [somewhere between $15M and $20M] for their Non-Recurring Engineering costs for both the development and qualification testing of the new strap assembly." (bracketed language in original). Thus, KSD argues that the government, and a SBA official, acknowledged that Boeing did not develop the "Fat Boy" at private expense, "and that Boeing was to be paid for the development costs after AMCOM issued the sole source contracts to Boeing." The government, however, dismisses the Massey memorandum, stating: "Given his [Mr. Massey's] responsibilities, it is hardly surprising to learn that AMCOM's representative for small business concerns would oppose implementation of a commercialization initiative in a case where a large firm is willing to risk substantial sums of money on its own research and development." Additionally, the government argues that Mr. Massey overestimated the price for the "Fat Boy" strap pack to be $15,000.00, when it was actually [deleted]. Finally, the government argues that even if Mr. Massey believed that the MDHC sole source contract was

inappropriate, he nevertheless approved the procurement of the "Fat Boy" strap packs through sole source procurement in 2001 and again in 2005.

In response to the plaintiff's argument that the Army erroneously claimed that the "Fat Boy" strap pack was a "commercial item," the government states that whether or not the "Fat Boy" strap pack was a "commercial item" or not "is wholly irrelevant to the question of whether the technical data rights concerning this item [the "Fat Boy"] belong to MDHC." First, the defendant argues that the Army never has asserted that the "Fat Boy" strap pack was a "commercial item" within the meaning of FAR 2.101(b). The defendant states that the fact that the Army was the only purchaser of the "Fat Boy" "does not change the fact that "the commercialization initiative was merely an attempt to rely on private research and development to implement new technologies," and that the Army is the only purchaser of the "Fat Boy" strap pack.

The defendant rebuts the plaintiff's argument that the government funded Boeing's research and development by arguing that there was never a contract between MDHC and the government that funded MDHC's research and development of the "Fat Boy" strap pack in a manner that would effect a transfer of technical data rights. Furthermore, the government claims that it had invited KSD to seek approval of a redesigned strap pack in the same manner and support as that provided to MDHC. The Army, therefore, contends that KSD's argument that AMCOM would reimburse MDHC after the fact for its research and development rests upon a misapprehension of the circumstances under which the government acquires technical data rights from a contractor. Specifically, the government cites DFARS 227.7103-4(a)(1) (2005) to argue that the government does not obtain technical data rights with respect to items that are developed at private expense. DFARS 227.7103-4(a)(1) states:

> (1) Technical data pertaining to items, components, or processes. Contractors or licensors may, with some exceptions (see 227.7103-5(a)(2) and (a)(4) through (9)), restrict the Government's rights to use, modify, release, reproduce, perform, display or disclose technical data pertaining to items, components, or processes developed exclusively at private expense (limited rights). They may not restrict the Government's rights in items, components, or processes developed exclusively at Government expense (unlimited rights) without the Government's approval. When an item, component, or process is developed with mixed funding, the Government may use, modify, release, reproduce, perform, display or disclose the data pertaining to such items, components, or processes within the Government without restriction but may release or disclose the data outside the Government only for government purposes (government purpose rights).

The defendant argues that the plaintiff has identified no portion of any government contract suggesting that the price of the "Fat Boy" included the research and development as a direct or indirect cost. Additionally, the defendant points out that the Army assigned the "Fat Boy" strap packs an AMRC code of 3D, meaning that AMCOM did not possess

"complete, accurate or current technical data required to competitively procure the parts." Finally, the defendant and defendant-intervenor point out that the contract between the Army and MDHC specifically stated that the government did not acquire any technical rights under the 2001 sole source contract.

The 2001 sole source contract between MDHC and AMCOM for "Fat Boy" strap packs clearly stated that: "Technical Data pertaining to Improved Strap Pack is not delivered under this contract[.] The Government's rights are limited to the rights defined in this clause." The clause referred to by the parties is DFARS 252.227-7015 (Nov. 1995),[6] which the parties made applicable only to the "Fat Boy" strap pack. Thus, the defendant and intervenor argue that the government had no rights to any of MDHC's technical data regarding the "Fat Boy" strap pack.

---

[6] DFARS 252.227-7015 states in relevant part that:

(b) License. (1) The Government shall have the unrestricted right to use, modify, reproduce, release, perform, display, or disclose technical data, and to permit others to do so, that–
(i) Have been provided to the Government or others without restrictions on use, modification, reproduction, release, or further disclosure other than a release or disclosure resulting from the sale, transfer, or other assignment of interest in the technical data to another party or the sale or transfer of some or all of a business entity or its assets to another party;
(ii) Are form, fit, and function data;
(iii) Are a correction or change to technical data furnished to the Contractor by the Government;
(iv) Are necessary for operation, maintenance, installation, or training (other than detailed manufacturing or process data); or
(v) Have been provided to the Government under a prior contract or licensing agreement through which the Government has acquired the rights to use, modify, reproduce, release, perform, display, or disclose the data without restrictions.
(2) Except as provided in paragraph (b)(1) of this clause, the Government may use, modify, reproduce, release, perform, display, or disclose technical data within the Government only. The Government shall not–
(i) Use the technical data to manufacture additional quantities of the commercial items; or
(ii) Release, perform, display, disclose, or authorize use of the technical data outside the Government without the Contractor's written permission unless a release, disclosure or permitted use is necessary for emergency repair or overhaul of the commercial items furnished under this contract.

At issue, therefore, before this court is whether the government paid for and obtained any rights to MDHC's "Fat Boy" technical data which could have been provided to KSD in order for KSD to manufacture and gain approval for its own improved main rotor strap assembly. To support its argument that the government obtains technical rights when it funds specific projects, the plaintiff cites to Ervin & Associates, Inc. v. United States, 59 Fed. Cl. 267, 296 (2004). In Ervin, a plaintiff, that had contracted to develop computer databases for the Department of Housing and Urban Development (HUD), argued that it had funded the creation of certain components of certain databases at private expense before it was awarded the HUD contract. See Ervin & Assocs, Inc. v. United States, 59 Fed. Cl. at 296. The court found, however, that Ervin did not specify what components of the database were developed at private expense. In addition, the court found that Ervin had developed the database in question in connection with the plaintiff's performance under other HUD contracts. Relying on opinions by the Armed Services Board of Contract Appeal, the court found that because in Ervin the plaintiff could not prove that the database components were paid for solely at private expense, the government was entitled to the technical data rights. Id. Specifically, the Ervin court stated that:

> "[a]ny . . . [g]overnment reimbursement . . . as a direct or indirect cost, of some of the costs of developing an item, component, or process would mean that that item, component, or process was not developed 'at private expense.' " [Bell Helicopter Textron, ASBCA No. 21,192, 85-3 BCA ¶ 18,415, 1985 WL 17050 (1985)] at 92,423, 1985 WL 17050; see also Megapulse, Inc., 1980 WL 17275 at *10, 1980 U.S. Comp. Gen. LEXIS 3819 at *10 (1980) (holding that where there is a "mixture of private and government funds, development is not at private expense and the Government gets unlimited rights to all the data.").

Ervin & Assocs, Inc. v. United States, 59 Fed. Cl. at 296; see also INSLAW, Inc. v. United States, 39 Fed. Cl. 307, 346 (1997) (applying Bell Helicopter Textron and holding that "[I]n order to prove private funding, INSLAW must demonstrate that the Government did not reimburse INSLAW for its indirect costs, other than de minimis indirect costs . . . .").

KSD's reliance on Ervin is misplaced and plaintiff's description of the law is inaccurate. The plaintiff argues that because the government may have paid for portions of Boeing's design, testing and approval of the "Fat Boy" strap pack, the government, therefore, is entitled to all technical data related to the "Fat Boy" and may provide that technical data to other contractors such as KSD. Although not discussed at length by either party, and certainly not identified by the plaintiff, the government's rights to technical data paid for either by the government or through private expense is controlled by 10 U.S.C. § 2320 (2000), "Rights in technical data." This statute proscribes the rights afforded to the government when procuring items through contracting procedures. That statute states in relevant part:

> (2)(A) In the case of an item or process that is developed by a contractor or subcontractor exclusively with Federal funds (other than an item or process

developed under a contract or subcontract to which regulations under section 9(j)(2) of the Small Business Act (15 U.S.C. 638(j)(2)) apply), the United States shall have the unlimited right to–

(i) use technical data pertaining to the item or process; or

(ii) release or disclose the technical data to persons outside the government or permit the use of the technical data by such persons.

(B) Except as provided in subparagraphs (C) and (D), in the case of an item or process that is developed by a contractor or subcontractor exclusively at private expense, the contractor or subcontractor may restrict the right of the United States to release or disclose technical data pertaining to the item or process to persons outside the government, or permit the use of the technical data by such persons.

* * * *

(E) In the case of an item or process that is developed in part with Federal funds and in part at private expense, the respective rights of the United States and of the contractor or subcontractor in technical data pertaining to such item or process shall be established as early in the acquisition process as practicable (preferably during contract negotiations) and shall be based upon negotiations between the United States and the contractor, except in any case in which the Secretary of Defense determines, on the basis of criteria established in the regulations, that negotiations would not be practicable.

* * * *

(F) A contractor or subcontractor (or a prospective contractor or subcontractor) may not be required, as a condition of being responsive to a solicitation or as a condition for the award of a contract–

(i) to sell or otherwise relinquish to the United States any rights in technical data except–

(I) rights in technical data described in subparagraph (C); or

(II) under the conditions described in subparagraph (D); or

(ii) to refrain from offering to use, or from using, an item or process to which the contractor is entitled to restrict rights in data under subparagraph (B). (emphasis added)

10 U.S.C. § 2320; see also DFARS 252.227-7015. The statute, thus, provides the government with the flexibility either to acquire technical data rights to an item procured from a contractor or negotiate that the government will not acquire the technical data rights. See Lockheed Martin Corp. v. United States, 42 Fed. Cl. 485, 495 n.7 (1998) ("[U]nder 10 U.S.C. § 2320, the source of funding for the research determines whether the government will obtain limited or unlimited rights to technical data generated by the research."), aff'd in part, reversed in part on other grounds, 210 F.3d 1366 (Fed. Cir. 2000); FN Mfg., Inc. v. United States, 42 Fed. Cl. 87, 93 (1998) (finding that "the negotiation process prescribed for the mixed funding situation imposes no minimum requirement as to the level of rights in technical data that the Government must obtain."). Furthermore, this statute provides

the government with the unlimited right to use and distribute technical data only when the item is developed "exclusively with Federal funds." 10 U.S.C. § 2320(a)(2)(A).

In addition to 10 U.S.C. § 2320, the government's acquisition of technical data rights is also controlled by 48 C.F.R. § 227.7103-1(a) (2005), which states that "DoD policy is to acquire only the technical data, and the rights in that data, necessary to satisfy agency needs." In this case, the intervenor argues that the government did not fund its research and development of the "Fat Boy" strap pack, but that instead MDHC funded its own research costs using independent research and development (IR&D) funding, which "constitutes 'development exclusively at private expense,' for which the government receives no rights to use the technical data for competitive purposes." FAR 31.205-18 (2005) defines IR&D as "a contractor's IR&D cost that consists of projects falling within the four following areas: (1) Basis research, (2) applied research, (3) development, and (4) systems and other concept formulation studies. The term does not include the costs of effort sponsored by a grant or required in the performance of a contract." The same regulation defines "development" as "the systematic use, under whatever name, of scientific and technical knowledge in the design, development, test, or evaluation of a potential new product or service (or of an improvement in an existing product or service) for the purpose of meeting specific performance requirements or objectives." 48 C.F.R. § 31.205-18. Furthermore, 48 C.F.R. § 9904.420-40(f)(2) (2005) requires that IR&D costs must be charged in the year in which they are expended, "The IR&D costs incurred in a cost accounting period shall not be assigned to any other cost accounting period, except as may be permitted pursuant to provisions of existing laws, regulations, and other controlling factors."

The intervenor argues that: "There can be no serious question that the "Fat Boy" development efforts fall squarely within the definition of IRAD [IR&D]." The intervenor further argues that consistent with the Cost Accounting Standards, MDHC charged the "Fat Boy" IR&D costs as an indirect expense allocated across all contracts in the business unit in the year in which the costs were incurred, and that for more than 40 years prevailing regulations have recognized that development with IR&D costs constitutes development at private expense, even if those costs are reimbursed indirectly to the government.

The clause at DFARS 252.227-7013(a)(7) (Nov. 1995) states that "Developed exclusively at private expense means development was accomplished entirely with costs charged to indirect cost pools, costs not allocated to a government contract, or any combination thereof." In INSLAW v. United States, 39 Fed. Cl. at 346, the United States Court of Federal Claims addressed the definition of "private expense" and stated that "'at private expense' means entirely funded without any Government reimbursement, direct or indirect, other than through IR&D [independent research and development] cost allocations." (quoting Bell Helicopter Textron, ASBCA No. 21,192, 85-3 BCA ¶ 18,415, 1985 WL 17050 (1985)). In Bell Helicopter, the Armed Services Board of Contract appeals held that:

> [I]t appears to be long established DOD policy – and the Government has not put the matter in issue here – that IR & D costs which are reimbursed in part through indirect cost allocations to Government contracts nevertheless represent "private expense" for purposes of the data rights clause. Any other Government reimbursement, however, as a direct or indirect cost, of some of the costs of developing an item, component, or process would mean that that item, component, or process was not developed "at private expense."

Id. Citing the above cases, the intervenor argues that "private expense" includes IR&D and all other indirect costs, and that MDHC used IR&D accounts to pay for its "Fat Boy" strap pack research and development. The intervenor further argues that even if it were reimbursed for its "Fat Boy" development costs as indirect costs in the 2001 "Fat Boy" contract, which it claims it was not, the "Fat Boy" strap pack would still be considered to have been developed at private expense. Although the intervenor has presented no evidence that it used IR&D funding to develop the "Fat Boy" strap pack, and has only argued this position in its briefs, the intervenor is correct that any IR&D costs expended by MDHC for development of the "Fat Boy" strap pack would be considered costs incurred at "private expense," and the plaintiff has not asserted to the contrary or offered contrary evidence.

Finally, in the 2001 contract signed between MDHC and the Army, the government specifically negotiated away any rights to acquire the technical data to the "Fat Boy" strap pack. The 2001contract stated: "Technical Data pertaining to Improved Strap Pack is not delivered under this contract." Therefore, under 10 U.S.C. § 2320, the government is not entitled to distribute to KSD proprietary information regarding the "Fat Boy" strap pack. Furthermore, as noted above, although the plaintiff argues that the government's claim that it did not fund MDHC's redesign of the "Fat Boy" strap pack is a "sham," the plaintiff has provided no evidence that the government indeed funded MDHC's research, testing and design. In sum, the Army's actions were not arbitrary or capricious.

The plaintiff next argues that AMCOM failed to comply with CICA's requirement to conduct market research, list interested sources, and list action that might be taken to overcome competitive barriers. The CICA at 10 U.S.C. § 2304(f)(3)(D),(E),(F) requires an agency anticipating a sole source contract to provide: "(D) a description of the market survey conducted or a statement of the reasons a market survey was not conducted; (E) a listing of the sources, if any, that expressed in writing an interest in the procurement; and (F) a statement of the actions, if any, the agency may take to remove or overcome any barrier to competition before a subsequent procurement for such needs." The plaintiff argues that the sections of the J&A signed on July 25, 2005 addressing market research indicate that "AMCOM does not meaningfully or substantively comply with CICA's requirements and are nothing more than rationalizations tailored for the purpose of restricting competition."

In this case, the July 25, 2005 justification stated that:

> Market Research as defined by FAR 10.001 has been performed in that a majority of the items, seventy-one of the one-hundred thirty-five were published in the December 2004 CASL [Competition Advocate Shopping List]. All remaining items will be published in future editions. Of the remaining 64 items, there is either no procurement history or these items have only been procured once within the last five years. The majority of those procured within the last five years were synopsized. These items have not been published in recent CASLs due to unprogrammed demands; however, they will be published in future CASL. There have been no additional sources of supply identified and none of these items are identified as commercial items.

The plaintiff relies on the following portion of FAR 10.001(a)(2)(v) (2005) to argue that the Army's market research was inadequate:

> (v) Agencies shall conduct market research on an ongoing basis, and take advantage to the maximum extent practicable of commercially available market research methods, to identify effectively the capabilities, including the capabilities of small businesses and new entrants into Federal contracting, that are available in the marketplace for meeting the requirements of the agency in furtherance of a contingency operation or defense against or recovery from nuclear, biological, chemical, or radiological attack; and
>
> (3) Use the results of market research to–
>
> (i) Determine if sources capable of satisfying the agency's requirements exist . . . .

48 C.F.R. § 10.001(a)(2)(v). In addition to the requirements for conducting market research set forth in FAR 10.001, FAR 10.002 (2005) establishes the procedures for conducting market research. Specifically, FAR 10.002 states:

> (a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.
>
> (b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.
>
> (1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience.
>
> (i) Whether the Government's needs can be met by–
>
> (A) Items of a type customarily available in the commercial marketplace;
>
> (B) Items of a type customarily available in the commercial marketplace with modifications; or
>
> (C) Items used exclusively for governmental purposes;
>
> * * * *

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Government wide database of contracts and other procurement instruments intended for use by multiple agencies available at http:// www.contractdirectory.gov and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

48 C.F.R. § 10.002.

The plaintiff in this case argues that FAR 10.001 charges the government with affirmatively determining if there were any other sources capable of producing the "Fat Boy" strap pack. As evidenced by the plain language of the regulation, however, FAR 10.002 does not set forth any specific method required to be used to conduct market research and recognizes that: "The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience." 48 C.F.R. § 10.002(b)(1); see also Space Research Corporation v. United States, 1980 WL 20811 (Cl. Ct. Sept. 3, 1980) (market survey in a sole source procurement consisted of publication of planned notice of reprocurement in the Commerce Business Daily upheld by the court); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d at 1074 (large scale market research conducted by two outside private consultants, PricewaterhouseCoopers, LLP, and MergeGlobal, Inc., which used publicly available data to conduct a market assessment of the air transportation industry for United States Postal Service sole source contract was found sufficient); Metric Systems Corp. v. United States, 42 Fed. Cl. 306, 313 (1998) (finding adequate a market survey consisting of personal interviews with contractor principles); Magnavox Electronic Systems Co. v. United States,

26 Cl. Ct. 1373, 1376-78 (1992) (sole source procurement based on a market survey consisting of a single posting in the Commerce Business Daily requesting solicitations from contractors with qualifications to produce a specific item was upheld).

In this case, the defendant conducted its market survey by publishing 71 parts of the 135 parts it sought for the 2005 contract in the Competition Advocate's Shopping List. The J&A further states that for the remaining 64 items no additional sources of supply had been identified. In addition, the Army posted its presolicitation notice on the FedBizOpps web site, which provided the opportunity for any interested contractor to indicate its interest in the "Fat Boy" procurement. The plaintiff in this case does not support its argument as to why it believes that publishing a list of desired parts in the CASL and publishing the presolicitation notice is an inadequate method of performing a market survey. Because the FAR does not provide for specific methods of conducting market research, and because plaintiff does not describe specific errors in the defendant's method in which it conducted market research, the plaintiff's argument fails.

In addition to arguing that the defendant's market research was inadequate, the plaintiff argues that it continually informed the Army that KSD was interested in and had the capability to produce an improved main rotor strap assembly. KSD points to a letter it sent to the Army in May, 1997, in which KSD stated: "K.S.D. Inc. is currently under contract with Atcom to produce existing Main Rotor Straps, and if required has the engineering expertise to increase the load carrying capacity of the Strap Assembly." In addition, in July, 1997, KSD submitted an unsolicited proposal to produce an improved strap pack, which the Army admits was misplaced. The plaintiff claims that in addition to notifying the Army in writing that KSD was capable of manufacturing an improved strap pack, KSD's market representative, Les McCollum, met with the Army's Competition Advocate, Wade Griffin, on an ongoing basis prior to the pre-solicitation notice during May, 2005. KSD argues that despite these meetings, Mr. McCollum signed and certified the July, 2005 J&A that stated: "There have been no additional sources of supply identified . . . ." Thus, KSD argues that AMCOM and the Competition Advocate were well aware of KSD's interest in the "Fat Boy" strap pack and that the justification's statement that "no additional sources for this item exits," is without merit. The plaintiff also argues that the "Interested Sources" synopsis and the "Efforts to Obtain Competition" and "Actions to Increase Competition" sections of the sole source justification are all without merit.

In response to the plaintiff's argument that the Army failed to ascertain whether other sources were capable of producing the "Fat Boy" strap packs, the government states that it ascertained that the "Fat Boy" strap pack had been assigned an AMRC code of 3D, which meant that AMCOM did not possess "complete, accurate or current technical data required to competitively procure] the parts and that "only MDHC possessed the necessary data." In addition, the government repeats its argument that it did not reimburse Boeing for its research and development of the "Fat Boy" strap pack and, therefore, the technical data was proprietary to MDHC. Further, the government states that upon reviewing the part, which was a "critical safety part," MDHC was the only "approved" source from which the Army could contract the "Fat Boy" and the defendant argues that: "Although KSD failed

to respond to this notice [the pre-solicitation notice] this failure does not mean AMCOM acted in derogation of its duties under CICA." Moreover, according to the defendant, KSD cannot "credibly contend that AMCOM violated CICA by failing to respond to the 'interest' that KSD expressed beginning in the 1990s and ultimately culminating in its oral communications with the Competition Advocate in 2005." The defendant argues that even if KSD had expressed an interest in producing a redesigned strap pack, that interest does not "transform" KSD into a qualified bidder to supply the "Fat Boy" strap pack. See Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. at 249 ("By asserting its place in the industry as a known supplier and its prior participation in a related procurement, Cubic's argument does not reflect the affirmative, responsive action that Note 22 and the CBD notice expected.").

In addition, the item being acquired by the Army in this case was an improved strap pack assembly, i.e. the "Fat Boy" strap pack. The Army had designated the "Fat Boy" as a "critical safety item" meaning that the part "can only be broken out to sources that have demonstrated the technical ability to produce this item, including possession of the necessary inspection/test equipment and manufacturing technology. Sources must be approved prior to being awarded a contract for this item." AMCOM Regulation 702-7 (Oct. 23, 2000) titled "Flight Safety Parts/New Source Testing Program Management" defined a Flight Safety Part (FSP) (Aircraft and Component) as "Any part, assembly, or installation containing a critical characteristic whose failure, malfunction, or absence could cause loss of or serious damage to the aircraft and/or serious injury or death to the occupants." The same regulation requires that all Flight Safety Parts "will only be procured from an approved source."

In this case, the Army has stated that only MDHC and two sub-vendors were approved to supply the "Fat Boy" strap pack: Klune Industries, Inc., and System 3, Inc. KSD, however, did not submit a Source Approval Request (SAR) to the Army and was not approved to supply the "Fat Boy" strap pack or any improved strap pack. Because the "Fat Boy" strap pack was considered a critical safety item and required prior source approval, the Army's market survey need not go outside of the approved sources. Even if by contacting AMCOM to express its interest in providing an improved strap pack as well as protesting the 2001 contract, KSD had shown sufficient interest in supplying the "Fat Boy" strap pack, the Army could not contract with KSD for the strap pack because KSD had not gone through the approval process. See MCI Tele. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir.1989) ("the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends . . . ."). In short, MDHC was the only approved source from which the Army could acquire "Fat Boy" strap packs and, therefore, the Army's decision to acquire the "Fat Boy" strap pack through a sole source contract to MDHC was reasonable.

The plaintiff's remaining two arguments allege that: 1) the contracting officer violated CICA by certifying that the J&A was accurate when it was not, in violation of 10 U.S.C. § 2304(f)(1)(a); and, 2) the government violated CICA by issuing a sole source award as a

direct result of failing to plan and obtain the proper non-recurring funding to support competition, in violation of 10 U.S.C. § 2304(f)(5)(A).

In arguing that the contracting officer violated CICA by certifying that the J&A was accurate, KSD summarily argues that "AMCOM knew it was 'using this sole source buy to re-pay Boeing/McDonnell [somewhere between $15M and $20M] for their Non-Recurring Engineering costs for both the development and qualification testing of the new strap assembly.'" (bracketed language in original). KSD argues that the contracting officer's certification that Boeing developed the "Fat Boy" strap pack completely at private expense is contrary to what AMCOM acknowledged the case to be. KSD argues, therefore, that the contracting officer's actions violated 10 U.S.C. § 2304 (f)(1)(A), which states that: "(A) the contracting officer for the contract justifies the use of such procedures in writing and certifies the accuracy and completeness of the justification."

In rebutting the plaintiff's argument that the contracting officer falsely certified the justification, the defendant argues that KSD "rehashes its first argument," and states that there is no evidence suggesting that the Army compensated MDHC for its costs of research and development associated with the "Fat Boy" strap pack. As the court explained above, the plaintiff brings forth no evidence that the Army directly paid MDHC for its research in developing the "Fat Boy," or acquired rights to the "Fat Boy" strap pack in any other way. For this reason, the plaintiff has failed to carry its burden and its argument that the contracting officer violated 10 U.S.C. § 2304(f)(1)(A) fails.

The plaintiff's final argument is that the government violated CICA by failing to properly plan for and fund the "Fat Boy" strap pack procurement. Specifically, the plaintiff alleges that the government violated 10 U.S.C. § 2304 (f)(5)(A) (2000), which states: "(5) In no case may the head of an agency–(A) enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions . . . ." See also 48 C.F.R. § 6.301(c) (reiterating the requirements of 10 U.S.C. § 2304 (f)(5)(A)). In support of its argument, the plaintiff points to the memo by the SBA Procurement Center Representative, Mr. Massey, in which Mr. Massey stated that "[t]he current undesirable sole source acquisition situation can be traced directly to the decision in the mid 1990s by the 'Strap Team' at St. Louis which did not adequately push the case for NRE [Non-Recurring Engineering] funds to support competition on re-design of an improved MR strap assembly."

Regarding the requirement to conduct proper planning, courts have found that planning of a contracted procurement need not be error free, but only need be reasonable. See Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. at 258 ("It is also well settled that advance planning need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable."(citing Sprint Communications Co., B-262003.2, 96-1 CPD ¶ 24 (June 10, 1996); Imperial Tooling & Mfg., B-249897, 92-2 CPD ¶ 436 (Dec. 23, 1992); Honeycomb Co. of America, B-225685, 87-1 CPD ¶ 579 (June 8, 1987)); see also Metric Systems Corp. v. United States, 42 Fed. Cl. at 312-13 (finding

sufficient evidence of advance planning described in the sole source justification and authority).

In response to the plaintiff's claim that the government failed to adequately plan for and fund the "Fat Boy" strap pack procurement, in addition to denying that a lack of planning was involved, the government argues that even if that were true, KSD was not prejudiced by any such failure. The government argues that even if the government's failure to plan or to obtain technical data rights is traceable to a budgeting or planning error, "KSD is still not a qualified source of the "Fat Boy" and cannot meet the Government's current demand." Thus, according to the government, even if the government competitively bid the "Fat Boy" strap pack, KSD could still not compete for the contract. Additionally, the defendant states that the government never reached the conclusion advocated by Mr. Massey, the SBA's Procurement Center Representative, because Mr. Massey's statements were "premised upon an erroneous assumption concerning the price of 'Fat Boy' strap packs," and assessment of the inaccuracy of Mr. Massey's assumptions, or their accuracy, were not addressed by the plaintiff.

Finally, the defendant argues that the Army's decision to procure "Fat Boy" strap packs without purchasing technical data rights does not evidence a lack of advance planning, but merely reflects the Army's discretionary determination that such a purchase would not be in the government's best interest. In support of this argument, the defendant cites to First Enterprise v. United States, 61 Fed. Cl. 109, 115 (2004), in which the court stated that "an agency has virtually a carte blanche right to decide the amount of funding it will spend on a given project" (citing Sinha v. Veterans Admin., 768 F.2d 330, 332 (Fed. Cir. 1985), cert. denied, 475 U.S. 1014 (1986)). In this case, the plaintiff has failed to bring forth sufficient evidence to prove that the Army's decision not to purchase the technical data rights stemmed from a lack of advanced planning.

In this case, the only evidence the plaintiff brings forth to prove its claim that the Army violated 10 U.S.C. § 2304 (f)(5)(A) is one document written by Mr. Massey, the SBA's Procurement Center Representative. Mr. Massey's statements, however, are unsupported by any other evidence cited to in the record. Mr. Massey's memorandum alone, without any additional supporting evidence, and especially given his role at the agency, is not sufficient to prove that the Army failed to properly plan funding for the research and development of the "Fat Boy" strap pack. Without any additional evidence, the plaintiff fails to carry its burden. See JWK Int'l Corp. v. United States, 49 Fed. Cl. 364, 370 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (2002) (recognizing the plaintiff's burden of proving a violation of 48 C.F.R. § 6.301(c)).

**4. Injunctive Relief Standard**

Plaintiff seeks preliminary and permanent injunctive relief. Courts, however, should interfere with the government procurement process "only in extremely limited circumstances." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003) (quoting CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting

United States v. John C. Grimberg Co., 702 F.2d at 1372)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); see also Mantech Telecomms. and Info. Sys. Corp. v. United States, 49 Fed. Cl. at 64 (2001) (emphasizing that injunctive relief is not routinely granted) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. See PGBA, LLC v. United States, 389 F.3d 1219, 1223 (Fed. Cir. 2004) (upholding the trial court's finding that "injunctions do not issue 'for every violation of the law . . . .'" (quoting PGBA, LLC v. United States, 60 Fed. Cl. 196, 222 (2004))); Bannum, Inc. v. United States, 56 Fed. Cl. 453, 457 (2003) (quoting Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991)), aff'd, 404 F.3d 1346 (Fed. Cir. 2005); Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 566 (2000); Delbert Wheeler Constr., Inc. v. United States, 39 Fed. Cl. 239, 251 (1997), aff'd, 155 F.3d 566 (Fed. Cir. 1998) (table); Compliance Corp. v. United States, 22 Cl. Ct. at 206 & n.10; but see Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1378 & n.6 (Fed. Cir. 1992). The decision on whether or not to grant an injunction is within the sound discretion of the trial court. See FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); Asociacion Colombiana de Exportadores de Flores v. United States, 916 F.2d 1571, 1578 (Fed. Cir. 1990). Confirming the difficult nature of obtaining injunctive relief in a bid protest case, the United States Court of Appeals for the Federal Circuit has stated that even if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction. See PGBA, LLC v. United States, 389 F.3d at 1225-26 (finding that the statutory scheme for reviewing procurement decision "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate," and that 28 U.S.C. § 1491(b)(4) "does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." FMC Corp. v. United States, 3 F.3d at 427.

To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties.

U.S. Ass'n of Imps. of Textiles and Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)); see also Pharmaceutical Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 670 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims . . . the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993) (finding a preliminary injunction to be a "drastic and extraordinary remedy that is not to be routinely granted"), cert. denied, 510 U.S. 1092

(1994); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523-24 (2003); OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) ("'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction," while highlighting that a preliminary injunction must not be granted unless the movant persuades through clear evidence. (quoting W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997))); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. at 616. The United States Court of Appeals for the Federal Circuit, in National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd., noted that:

> [A] movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits. . . . In other words, a district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.

Nat'l Steel Car, Ltd. v. Can. Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (citation and footnote omitted), reh'g and reh'g en banc denied (2004). In addition, a movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted. See Yakus v. United States, 321 U.S. 414, 440 (1940) ("But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." (citing, among other cases, Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 552 (1937) (clarifying that even private controversies, to the extent they may seriously impair service to the public, are a matter of public concern))) (footnote omitted).

Plaintiff also seeks permanent injunctive relief. The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits. See Amoco Prod. Co. v. Vill. of Gambill, Alaska, 480 U.S. 531, 546 n.12 (1987) (holding that the standard for permanent injunction is the same as that for preliminary injunction, with the one exception being that the plaintiff must show actual success on the merits, rather than likelihood of success). In PGBA, LLC v. United States, the Federal Circuit set out the test for a permanent injunction, stating that a court must consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d at 1228-29 (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. at 546 n.12); see also Nat'l Steel Car, Ltd. v. Canadian Pacific

Ry., Ltd., 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief); Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 159 (2005); Hunt Building Co., Ltd. v. United States, 61 Fed. Cl. at 279; Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. at 320-21 (citing Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000), aff'd, 10 Fed. Appx. 957 (Fed. Cir. 2001)); ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 n.10 (1997) ("'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.'" (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 546 n.12)). The court is not persuaded that the extraordinary remedy of permanent injunctive relief is warranted in this case.

The first step of any bid protest case is to determine whether the government's actions were arbitrary, capricious, or not in accordance with the law. See Bannum, Inc. v. United States, 404 F.3d at 1351 ("A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."). Only after making these determinations can the court turn to whether the plaintiff is entitled to injunctive relief.

In this case, the plaintiff has argued that the government's actions violated CICA by failing to properly compete the contract for "Fat Boy" strap packs. After reviewing the government's actions, and as discussed in detail above, the court finds that the Army acted reasonably in soliciting the "Fat Boy" contract. The court finds that the government did not improperly withhold technical data rights, which it did not have, and did not improperly justify the sole source procurement based upon its lack of technical data rights pertaining to the "Fat Boy" strap pack. In the 2001 contract, the government specifically negotiated away its rights to any technical rights for the "Fat Boy" strap pack. Therefore, when the government solicited the 2005 contract, it properly indicated that it did not have technical data rights and that Boeing was the only approved source of the "Fat Boy" strap pack. Moreover, KSD was not an approved source to supply the product. Because the plaintiff has not proven that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, or that the plaintiff was prejudiced, the court denies the plaintiff's motion for preliminary and permanent injunctive relief.

## CONCLUSION

For the reasons discussed above, the court **DENIES** the plaintiff's motion for judgment upon the administrative record and plaintiff's motions for preliminary and permanent injunction. The court **GRANTS** the defendant's and intervenor's motions for judgment upon the administrative record. The Clerk of the Court shall enter **JUDGMENT** in accordance with this opinion. Because this opinion is issued under seal, within 14 days

after this opinion is issued, the parties shall submit a joint proposed redacted version of the opinion for release. No costs.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**JUDGE**